NORMAN J. BLEARS (Bar No. 95600)
HELLER EHRMAN LLP
275 Middlefield Road
Menlo Park, CA 94025
Telephone: (650) 324.7000
Facsimile: (650) 324.0638
Email:  Norman.Blears@hellerehrman.com

SARA B. BRODY (Bar No. 130222)
BENJAMIN T. DIGGS (Bar No. 245904)
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA 94104
Telephone: (415) 772.6000
Facsimile: (415) 772.6268
Email:  Sara.Brody@hellerehrman.com
         Benjamin.Diggs@hellerehrman.com

Attorneys for Nominal Defendant
AUTODESK, INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re Autodesk, Inc. Derivative Litigation, | Master File No. C-06-07185-PJH |
| | DERIVATIVE ACTION |
| This Document Relates To:<br>ALL MATTERS | **NOMINAL DEFENDANT AUTODESK, INC.'S NOTICE OF MOTION, MOTION TO DISMISS FOR FAILURE TO MAKE PRE-SUIT DEMAND AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | The Honorable Phyllis J. Hamilton |
| | Date:        September 17, 2008<br>Time         9:00 a.m.<br>Place:       Courtroom 3 |

1

**Table of Contents**

2

**Page**

I.      INTRODUCTION ............................................................................................1

II.     BACKGROUND ..............................................................................................3

III.    ARGUMENT....................................................................................................7

      A.      Plaintiffs Cannot Satisfy The Stringent Demand Futility Standards
            Set Forth In A Well-Developed Body Of Law. .......................................7

      B.      Plaintiffs Fail To Establish Demand Futility With Respect To The
            Monthly Grants To Employees. ...........................................................11

            1.      Plaintiffs Cannot Tie The Compensation Committee Members
                       To The Challenged Grants. ......................................................12

            2.      Plaintiffs Cannot Tie The Audit Committee Members To The
                       Challenged Grants....................................................................15

      C.      Plaintiffs Fail To Establish Demand Futility With Respect To Any
            Other Grants............................................................................................17

      D.      Plaintiffs' Additional Boilerplate Allegations Do Not Establish
            Demand Futility. ....................................................................................18

      E.      Plaintiff Giles Lacks Standing To Pursue Derivative Claims And
            Plaintiff Peach's Pleading Regarding Standing Is Inadequate..............20

IV.    CONCLUSION...............................................................................................21

NOTICE OF MOTION, MOTION TO DISMISS AND MEM. OF P'S AND A'S
MASTER FILE NO. C-06-07185-PJH

## Table of Authorities

Page

**Cases**

*Aronson v. Lewis*,
    473 A.2d 805 (Del. 1984) ........................................................................................ 7-9

*Beam v. Stewart*,
    845 A.2d 1040 (Del. 2004) ........................................................................................ 19

*Bell Atlantic Corp. v. Twombly*,
    127 S.Ct. 1955 (2007) ............................................................................................. 13

*Braddock v. Zimmerman*,
    906 A.2d 776 (Del. 2006) .......................................................................................... 5

*Caviness v. Evans*,
    229 F.R.D. 354 (D. Mass. 2005) ............................................................................. 19

*Desimone v. Barrows*,
    924 A.2d 908 (Del. Ch. 2007) .......................................................................... *passim*

*Guttman v. Huang*,
    823 A.2d 492 (Del. Ch. 2003) .................................................................................... 9

*In re Baxter Int'l S'holders Litig.*,
    654 A.2d 1268 (Del. Ch. 1995) .................................................................................. 9

*In re Caremark Int'l Inc. Deriv. Litig.*,
    698 A.2d 959 (Del. Ch. 1996) .................................................................................. 15

*In re CNet Networks, Inc. S'holder Deriv. Litig.*,
    483 F. Supp. 2d 947 (N.D. Cal. 2007) ............................................................... *passim*

*In re Cray Inc. Deriv. Litig.*,
    431 F. Supp. 2d 1114 (W.D. Wash. 2006) ............................................................... 14

*In re E.F. Hutton Banking Practices Litig.*,
    634 F. Supp. 265 (S.D.N.Y. 1986) .......................................................................... 19

*In re F5 Networks, Inc. Deriv. Litig.*,
    2007 WL 2476278 (W.D. Wash. Aug. 6, 2007) ...................................................... 14

*In re Finisar Corp. Deriv. Litig.*,
    -- F. Supp. 2d -- , 2008 WL 131867 (N.D. Cal. Jan. 11, 2008) ................................ 7, 9, 14

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) .................................................................... 9

*In re MIPS Tech., Inc. Deriv. Litig.*,
     --- F. Supp. 2d ---, 2008 WL 131915 (N.D. Cal. Jan. 11, 2008) ...................................*passim*

*In re Openwave Sys., Inc. S'holder Deriv. Litig.*,
     2008 WL 410259 (N.D. Cal. Feb. 12, 2008)......................................................................... 9

*In re PMC-Sierra, Inc. Deriv. Litig.*,
     2007 WL 2427980 (N.D. Cal. Aug. 22, 2007)..................................................................... 9

*In re Silicon Graphics, Inc. Sec. Litig.*,
     183 F.3d 970 (9th Cir. 1999)......................................................................................... 7-9

*In re Verisign, Inc. Deriv. Litig.*,
     531 F. Supp. 2d 1173 (N.D. Cal. 2007) ......................................................................*passim*

*In re Zoran Corp. Deriv. Litig.*,
     511 F. Supp. 2d 986 (N.D. Cal. 2007) ...........................................................9, 10, 18, 20

*Lewis v. Graves*,
     701 F.2d 245 (2d Cir. 1983) ............................................................................................ 8

*Lewis v. Sporck*,
     612 F. Supp. 1316 (N.D. Cal. 1985) .............................................................................. 19

*Nach v. Baldwin*,
     2008 WL 410261 (N.D. Cal. Feb. 12, 2008) .............................................................. 7, 9

*Rales v. Blasband*,
     634 A.2d 927 (Del. 1993).............................................................................................. 7,8

*Risberg ex rel. Aspen Tech., Inc. v. McArdle*,
     529 F. Supp. 2d 213 (D. Mass. 2008) ............................................................................ 9

*Ryan v. Gifford*,
     918 A.2d 341 (Del. Ch. 2007) ................................................................................... 8, 20

*White v. Panic*,
     783 A.2d 543 (Del. 2001)............................................................................................. 17

**Statutes and Rules**

15 U.S.C. § 78p(b)......................................................................................................... 6

8 Del. C. § 102(b)(7) ..................................................................................................... 9

17 C.F.R. § 240.16b-3(d)(1) .......................................................................................... 6

Fed. R. Civ. P. 23.1 ....................................................................................................... 7

**NOTICE OF MOTION AND MOTION TO DISMISS**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on September 17, 2008, at 9:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Phyllis J. Hamilton, United States District Court, 450 Golden Gate Avenue, San Francisco, CA 94102, nominal defendant Autodesk, Inc. (Autodesk or the company) will move the Court for an Order under Rules 12(b)(6) and 23.1 dismissing the Amended Verified Derivative Complaint (Com.) filed by plaintiffs James Giles and Nancy Peach.  Autodesk's motion is based on this Notice of Motion and Motion; the supporting Memorandum of Points and Authorities; the Request for Judicial Notice in Support of Autodesk's Motion to Dismiss; the [Proposed] Order; all pleadings and papers filed herein; oral argument of counsel; and any other matter that may be submitted at the hearing.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

In the summer of 2006, Autodesk, along with scores of other technology companies, announced that a committee of its board had begun investigating the corporation's historical option granting procedures.  Without waiting for the results of that investigation, plaintiff James Giles, who had bought stock in the company earlier that year, filed a complaint, purportedly on behalf of the corporation, accusing nearly all of the company's directors of breaching their fiduciary duties and violating federal securities laws between 1996 and the spring of 2006.

Autodesk, meanwhile, continued its internal investigation, and in June 2007 published the results in a detailed and unflinching report filed with the Securities and Exchange Commission.  In that report, the company announced that it had discovered that during a five-year period, numerous broad-based monthly grants had been made to employees pursuant to a process in which grant dates were selected to coincide with monthly lows in the trading price of the company's stock.  The company also learned and disclosed that one new-hire grant made to an officer in 1992 had been recorded using an incorrect measurement date.  In order to address the accounting issues that arose in connection with these and other discoveries, the company announced that it was restating its financial statements to take aggregate non-cash compensation charges totaling $34.8 million over

1

1  an 18-year period.

2       In the wake of these events, plaintiff Giles, now joined by a second shareholder, amended

3  his earlier complaint and incorporated the company's own findings into renewed accusations of

4  fiduciary breach and violation of securities laws.  The difficulty plaintiffs face, of course, is that

5  these claims belong not to them but to the company itself, which has been actively managing the

6  events flowing from its option granting practices for nearly two years now.  In order to justify their

7  attempt to seize control from the board and pursue the company's claims by themselves, plaintiffs

8  contend that the board is incapable of considering those claims impartially.  Under controlling law,

9  however, plaintiffs cannot succeed with this strategy unless they can establish, by means of

10  particularized facts, that a majority of Autodesk's board is interested or lacking in independence.

11       Plaintiffs have not come close to making that showing here.  Autodesk's board at the

12  relevant time had ten members.  Only one of the ten was involved even indirectly in any of the

13  processes that led to the need for a restatement.  The other nine directors have not been tied in any

14  meaningful way to those processes; nor are they alleged to have received misdated options.

15  Indeed, two of the nine are not even defendants in this action.

16       In an effort to overcome this basic arithmetical problem, plaintiffs rely heavily on the

17  committee service of the seven remaining directors, alleging that each was a member of the

18  company's Compensation Committee, Audit Committee or both.  But case after case holds that bare

19  allegations of committee membership cannot establish interest or lack of independence.  The

20  outcome should be no different here.  Plaintiffs' committee membership allegations are entirely

21  devoid of the particularized facts that would be necessary to link a director to the conduct that gave

22  rise to the company's restatement – let alone to any *mis*conduct.  Plaintiffs' allegations, indeed, lead

23  to the conclusion that the committees on which these seven board members served were *divorced*

24  from the processes governing the employee option grants in question:  The very sources on which

25  plaintiffs rely establish that the committees had no authority to make or execute grants to non-

26  executive employees.  Plaintiffs therefore have not shown, as they must, that a majority of the board

27  is disabled from dispassionately assessing potential claims arising from the employee option grants.

28       Nor have plaintiffs demonstrated directorial interest or lack of independence in connection

NOTICE OF MOTION, MOTION TO DISMISS AND MEM. OF P'S AND A'S
MASTER FILE NO. C-06-07185-PJH

with any of the *other* option grants discussed in the amended complaint or the restatement on which it is based. The facts alleged do not show anything more than innocent errors with respect to any of the other relevant grants. Plaintiffs certainly have not established, as they must under controlling law, that a majority of Autodesk's board faces a substantial likelihood of liability arising from those grants.

In the end, what emerges from the complaint is that Autodesk, like many other companies, discovered errors when it investigated its historical option-granting processes, and that it has dealt with those errors in a comprehensive and forthright manner. This does not mean that all – or any – directors were involved in wrongdoing or are incapable of responding to the situation in the company's best interests. Indeed, the very findings on which plaintiffs rely demonstrate the opposite – that Autodesk's board can act, and has acted, in a disinterested and independent manner. Measured against the record of thorough investigation and disclosure that emerges from plaintiffs' own materials, this is the *last* case in which individual shareholders should be permitted to disrupt the normal course of corporate governance and wrest control of the company's business from the board members elected to direct it.

## II.   BACKGROUND

Autodesk, a Delaware corporation, is one of the world's leading design software companies, serving customers in architecture, engineering, manufacturing and a number of other markets. Com. ¶ 21; Ex. A at 5.[1]  On August 17, 2006, Autodesk announced that its Audit Committee was conducting a voluntary review of the company's historical stock option granting practices, together with any accounting issues connected with those practices. Com. ¶ 42. The committee's review, as it unfolded over the succeeding months, turned out to be extensive. The Audit Committee hired independent outside legal counsel and forensic accounting experts. *Id.*; Ex. A at 33. With their

---

[1] All "Ex. _" citations in this brief refer to the exhibits attached to Autodesk's Request for Judicial Notice (RJN), which is being filed together with this motion. As set forth in the RJN, it is appropriate for this Court to take notice of Autodesk's Form 10-K (Ex. A). Moreover, since plaintiffs themselves rely on portions of that document, defendants may appropriately rely on other portions of the filing as a substantive matter. *E.g., In re CNet Networks, Inc. S'holder Deriv. Litig.*, 483 F. Supp. 2d 947, 953, 963, 966 (N.D. Cal. 2007) ("Plaintiffs are not entitled to pick and choose which of defendants' statements in public documents favor them and have all others ignored").

assistance, the committee investigated the company's option granting practices dating back to 1988; it interviewed more than 40 witnesses and examined over 700,000 documents.  Ex. A at 33.

While the Audit Committee was engaged in this process, plaintiff James Giles filed a complaint, purportedly on behalf of the company, in which he accused nearly all of the company's then-current directors of fiduciary breaches in connection with option grants.  The Giles complaint, which was filed on November 20, 2006, was followed by a second federal complaint in December 2006, and by an action in Marin County Superior Court in January 2007.[2]  The various complaints were all based on the same allegations, and the two federal actions were consolidated in this Court.

Autodesk's Audit Committee completed its review in February 2007, and announced preliminary findings.  Ex. A at 33.   In June 2007, the company filed a Form 10-K, in which it issued restated financial statements for fiscal years 2003-2006 and explained in detail both the reasons for the restatement and the results of its stock option investigation.  *Id.* at 3-4, 33-38, 85-89.  That discussion demonstrates the independence and disinterestedness of the board far better than any argument by counsel could, for it reveals beyond any doubt that the board is willing to reach and disclose conclusions that are disadvantageous to its own members and to management.  The Form 10-K states, for example, that "[t]hroughout the relevant period, numerous administrative errors were made in the processing of option grants resulting in options being accounted for incorrectly."  *Id.* at 33.  Even more significantly, Autodesk concluded that

> [b]etween July 2000 and February 2005, the Company made monthly broad-based employee grants pursuant to authority delegated by the Board to the CEO, where the grant dates for most of these broad based grants were selected by an administrative process to coincide with low trading prices during the month of the applicable grant.

*Id.*; Com. ¶¶ 53, 75.  Autodesk also found and discussed measurement date errors in seven grants made between 1997 and 2000.  Com. ¶ 98.  Additional problems were discussed under the headings (among others) of "Anomalous Add Grants," and "Board-Authorized Grant."  *Id.*; Ex. A at 35-36.[3]

*Each* of these unfavorable findings demonstrates that Autodesk's board as a whole and its

---

[2] On April 21, 2008, the Marin County Superior Court issued a tentative order granting the company's motion to stay that action in favor of this federal proceeding.  Plaintiff's counsel in the Marin County action has advised us that plaintiff will not oppose the tentative order.

[3] We discuss plaintiffs' allegations concerning these latter grants at pages 17-18, below.

4

Audit Committee in particular were entirely capable of acting impartially and independently, and of exposing problems, with great precision, at both the management and the board levels.  At the same time, the company made clear in its restatement that the problems it had discovered were limited in certain important ways.   The company stated that:

- "There was no evidence that any officer or director backdated any stock option granted to himself or herself";

- "Based on the evidence developed during the review, the Audit Committee concluded that it was unlikely that those involved in the decisions and actions that resulted in measurement date errors understood the accounting impact of their actions or that they intended to misstate our financial statements"; and

- "There was no evidence of any measurement date error involving any stock option grant made to a person serving as a director."

Ex. A at 33-34.  In addition, while the Audit Committee found that grant dates for monthly broad-based employee grants had been "selected by an administrative process to coincide with low trading prices," there was no comparable finding of "selection" with respect to any other grant subject to restatement.

The numerical analysis that emerges from this discussion, much like the fact that Autodesk's board has shown itself willing to reach and disclose unfavorable conclusions, is fatal to plaintiffs' demand futility allegations.  Autodesk's board had ten members when the original complaint in this action was filed:  Carol Bartz, Carl Bass, Mark Bertelsen, Crawford Beveridge, J. Hallam Dawson, Michael Fister, Per-Kristian Halvorsen, Steven Scheid, Mary Alice Taylor and Larry Wangberg.[4]  Only one director, former CEO Carol Bartz, is alleged to have received a problematic grant – the new-hire grant made to her when she joined the company in 1992, five years before the commencement of the period on which plaintiffs' claims are based.  Com. ¶ 2

_____

[4] After the original complaint was filed, two directors, Scheid and Taylor, resigned from the board, and four new directors joined.  We analyze plaintiffs' demand futility allegations by reference to the board in place when the original complaint was filed.  *See Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006) (court looks to board as it existed when the original complaint was filed, so long as the claims alleged in the amended complaint were "already validly in litigation" under the original complaint).  If plaintiffs' demand futility allegations were instead analyzed with reference to the current board, those allegations would be even weaker, since six of the twelve current directors are not even defendants in this action.

NOTICE OF MOTION, MOTION TO DISMISS AND MEM. OF P'S AND A'S
MASTER FILE NO. C-06-07185-PJH

1   (defining 1997-2005 as the "Backdating Period").[5]  Bartz is also the only director linked even

2   indirectly to the administrative process in which grant dates were selected to coincide with low

3   stock prices for employee grants.  Nothing has been alleged to call into doubt the impartiality of

4   any of the remaining nine directors.  Two of the nine – Bass and Fister – are not even defendants

5   here.  Plaintiffs' contentions with respect to the other seven are based very largely on the fact that

6   they served on board committees; as we discuss below, such allegations have been found to be

7   inadequate in a long line of cases.

8         A final significant fact emerging from the company's restatement bears emphasis.  There

9   were various categories of option grants made at Autodesk, and the authority for making those

10  grants belonged to different bodies.  Grants to employees, as plaintiffs themselves repeatedly state,

11  were made "pursuant to authority delegated by the Board to the CEO."  Ex. A at 33; *see also* Com.

12  ¶¶ 3, 56 (board delegated authority to CEO to issue options to employees as a "committee of one").

13  Grants to executive officers, by contrast, were made by the Compensation Committee.  Ex. A at 33,

14  35.  This allocation of responsibility tracks federal law, which requires that grants to executives be

15  made by outside board members in order to qualify for exemption from short-swing trading

16  liability, but contains no comparable requirement for grants to rank-and-file employees, since such

17  employees are not subject to short-swing trading restrictions in the first place.  15 U.S.C. § 78p(b);

18  17 C.F.R. § 240.16b-3(d)(1).  Autodesk's allocation of authority for option grants also comports

19  with the realities of corporate decision making and execution.  As the Delaware Chancery Court has

20  recognized, it would be improper to infer that a board's compensation committee exercises

21  authority over employee option grants even in a case where (in contrast to this one), the company's

22  public filings leave unclear how that authority was delegated.  *Desimone v. Barrows*, 924 A.2d 908,

23  938 (Del. Ch. 2007).  This is because it simply "defies logic" to suppose that outside board

24  members would be closely enough involved with the day-to-day affairs of a company and the

25

26         [5] Plaintiffs do not (and cannot) allege that Bartz had the ability to influence or control the
    company's selection of the measurement date for this grant, which was made to her before she

27  assumed office.  Nevertheless, for purposes of this pleading motion, the company does not dispute
    plaintiffs' allegation that Bartz – a single member of the ten-member board – is interested in the

28  challenged transactions.

NOTICE OF MOTION, MOTION TO DISMISS AND MEM. OF P'S AND A'S
MASTER FILE NO. C-06-07185-PJH

compensation of its employees to exercise control over the mechanics of option grants to them. *Id.*

In the face of both this logic and the explicit statements in the 10-K explaining how option-granting authority was delegated at Autodesk, plaintiffs here try to blur together the two distinct lines of authority – from the board to management for employee grants, and from the board to the Compensation Committee for executive grants. Com. ¶¶ 57-63. However helpful plaintiffs may believe this blurring is to their demand futility allegations, the very text on which they rely makes plain that these two tracks are distinct. We discuss the implications of that distinction more fully at pages 12-13, below.

## III.   ARGUMENT

### A.   Plaintiffs Cannot Satisfy The Stringent Demand Futility Standards Set Forth In A Well-Developed Body Of Law.

As this Court is well aware through its recent rulings in other option-dating litigation, the first step in a derivative action such as this one is to determine whether shareholder plaintiffs have standing to pursue claims on the company's behalf. *In re Verisign, Inc. Deriv. Litig.*, 531 F. Supp. 2d 1173, 1188 (N.D. Cal. 2007). Because such claims belong to the company itself, plaintiffs may not proceed with them unless they have either made a demand on the board of directors or shown, by means of particularized facts, that such a demand would be futile. *Id.*; Fed. R. Civ. P. 23.1. Demand futility is assessed under state law – here, the law of Delaware, since that is where Autodesk is incorporated. Com. ¶ 21; *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 989-90 (9th Cir. 1999).

Delaware law contains two tests for evaluating demand futility: the two-step *Aronson* test and the single-step *Rales* test. *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984); *Rales v. Blasband*, 634 A.2d 927 (Del. 1993); *see also Verisign*, 531 F. Supp. 2d at 1188 (summarizing tests); *In re Finisar Corp. Deriv. Litig.*, --- F. Supp. 2d ---, 2008 WL 131867, at *6-7 (N.D. Cal. Jan. 11, 2008) (same). The *Rales* test and the first prong of the *Aronson* test are similar: Under both, a court looks at whether plaintiff has established, by means of particularized factual allegations, that a majority of the board is interested and or lacking in independence. *Aronson*, 473 A.2d at 814; *Rales*, 634 A.2d at 934; *see also, e.g.*, *Nach v. Baldwin*, 2008 WL 410261, at *3 (N.D. Cal. Feb. 12, 2008)

1   (*Aronson*'s "first prong is essentially the same as the *Rales* test").  The second prong of the *Aronson*

2   test requires plaintiffs to establish that a challenged board action was not the product of a valid

3   exercise of business judgment.  *Aronson*, 473 A.2d at 814.  For obvious reasons, this second prong

4   can be applied only where plaintiff challenges an action of the board.  *E.g., Verisign*, 531 F. Supp.

5   2d at 1188.  The *Rales* test controls here, where the transactions on which plaintiffs' claims are

6   principally based were undertaken by management rather than the board.[6]

7           In the present case, as in countless others filed since *Aronson* was decided, plaintiffs seek to

8   show directorial interest and lack of independence through the simple expedient of making a

9   majority of the board members defendants, and then contending that because they would have to

10  "sue themselves" if they found the derivative claims to be meritorious, they cannot possibly

11  consider those claims impartially.  Com. ¶¶ 119, 125, 128.  If allegations of this sort were

12  sufficient, of course, it would spell the end of any meaningful demand requirement, since plaintiffs

13  could establish directorial interest in every case simply by naming as defendants all or a majority of

14  the directors.   Under controlling law, therefore, a director defendant is not interested or lacking in

15  independence merely because plaintiff has chosen to sue him or her.  *Aronson*, 473 A.2d at 818

16  (rejecting as a "bootstrap argument" the tactic of making directors defendants and then contending

17  that they cannot be expected to "sue themselves"); *see also Lewis v. Graves*, 701 F.2d 245, 249 (2d

18  Cir. 1983) ("this transparent litigation tactic is like sleight of hand that is *slower* than the eye")

19  (emphasis in original).  Rather, plaintiff can overcome the presumption of directorial impartiality

20  only where the particularized allegations in the complaint "show the defendants' actions 'were so

21          [6] *Aronson*'s second prong may also apply where the challenged actions were taken by a

22  committee that constitutes a majority of the board:  In that case, the committee's actions are
    ascribed to the board as a whole.  *Ryan v. Gifford,* 918 A.2d 341, 353 (Del. Ch. 2007).  That rule

23  does not apply here.  Although plaintiffs allege that seven of the board's ten members sat on the
    Compensation Committee, the Audit Committee or both, plaintiffs do not allege that either

24  committee consisted of more than four directors during any relevant period.  Consequently, actions
    taken by these committees were always performed by a *minority* of board members.  In any event,

25  as discussed more fully below, plaintiffs do not allege facts connecting the members of the relevant
    committees to the purported conduct on which the derivative claims are based.  *Infra* at 12-17.  In

26  this situation too, this Court declines to reach the second prong of *Aronson*.  *E.g., Verisign*, 531 F.

27  Supp. 2d at 1188-89 (second prong is "inapplicable" where "the facts as pled show that a majority
    of the Board members that would have considered the demand were not involved in any decision to

28  backdate the option grants").

egregious that a substantial likelihood of director liability exists.'" *Silicon Graphics*, 183 F.3d at 990 (quoting *Aronson*, 473 A.2d at 815). As the Delaware Supreme Court has noted, this will be so only in "rare cases." *Aronson*, 473 A.2d at 815.

The "substantial likelihood" requirement, by design, thus presents a high hurdle for derivative plaintiffs to clear. As a procedural matter, plaintiffs are required by Rule 23.1 to make out the case for liability with particularized facts; conclusory allegations are insufficient. *Silicon Graphics*, 183 F.3d at 990. As a substantive matter, plaintiffs must confront the reality that most corporations – and Autodesk is no exception – have adopted charter provisions immunizing directors from liability for all but the most extreme fiduciary breaches – a step explicitly authorized by Delaware law. 8 Del. C. § 102(b)(7); Ex. B at 7 (Articles of Incorporation exempt directors from liability to the company for fiduciary breaches "to the fullest extent permitted by the General Corporation Law").[7] In order to establish demand futility, plaintiffs must demonstrate that the directors' likelihood of being found liable is "substantial" even in the face of this protection – and again, must do so by means of particularized facts. *Risberg ex rel. Aspen Tech., Inc. v. McArdle*, 529 F. Supp. 2d 213, 222 (D. Mass. 2008).[8]

This Court has now had occasion to apply Delaware's demand futility law in a sizeable and growing series of option-dating cases. *E.g., In re Openwave Sys., Inc. S'holder Deriv. Litig.*, 2008 WL 410259 (N.D. Cal. Feb. 12, 2008); *Nach*, 2008 WL 410261; *Finisar*, 2008 WL 131867; *In re MIPS Tech., Inc. Deriv. Litig.*, --- F. Supp. 2d ---, 2008 WL 131915 (N.D. Cal. Jan. 11, 2008); *Verisign*, 531 F. Supp. 2d 1173; *In re PMC-Sierra, Inc. Deriv. Litig.*, 2007 WL 2427980 (N.D. Cal. Aug. 22, 2007); *In re Zoran Corp. Deriv. Litig.*, 511 F. Supp. 2d 986 (N.D. Cal. 2007); *In re*

---

[7] This Court routinely takes notice of Section 102(b)(7) provisions in ruling on motions to dismiss. *E.g., In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1278 & n. 18 (N.D. Cal. 2000); RJN at 1 (citing additional authorities).

[8] This rule, which has recently been applied in the context of option-dating litigation, *id.*, also has deep roots in older Delaware law governing derivative actions. *E.g., Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003) ("a serious threat of liability may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors based on particularized facts") (emphasis in original); *In re Baxter Int'l S'holders Litig.*, 654 A.2d 1268, 1270 (Del. Ch. 1995) ("When the certificate of incorporation exempts directors from liability, the risk of liability does not disable them from considering a demand fairly unless particularized pleading permits the court to conclude that there is a substantial likelihood that their conduct falls outside the exemption").

NOTICE OF MOTION, MOTION TO DISMISS AND MEM. OF P'S AND A'S
MASTER FILE NO. C-06-07185-PJH

1   *Openwave Sys., Inc. S'holder Deriv. Litig.*, 503 F. Supp. 2d 1341 (N.D. Cal. 2007); *In re CNet*

2   *Networks, Inc. S'holder Deriv. Litig.*, 483 F. Supp. 2d 947 (N.D. Cal. 2007).   In each of these

3   cases, as here, an independent committee of the board investigated and reported on the company's

4   historical option-dating practices.  After the examination was concluded, the board in each case

5   published the findings of the investigation, and in each case, announced that the company would

6   need to restate its financial statements.  But in *no* case did this Court assume that because errors

7   were made in the company's financial statements – or even because intentional date-picking had

8   occurred, *e.g., MIPS*, 2008 WL 131915, at *3 – the board was incapable of independently assessing

9   claims against its own members or members of management.  Rather, in each case, the Court

10  carefully examined both plaintiffs' allegations of backdating and the link – if any – between the

11  erroneous practices the corporation employed and current members of the board.  In all but one case

12  (*Zoran*), this Court has concluded that plaintiffs *failed* to establish such a link with respect to a

13  majority of board members, and hence that plaintiffs also *failed* to demonstrate that those board

14  members faced a substantial likelihood of liability.  All but one of these cases were therefore

15  dismissed based on plaintiffs' failure to make a demand on the board or establish demand futility.

16  That is precisely what should happen here.[9]

17       Before examining plaintiffs' demand futility allegations in more detail, it is worth

18  emphasizing an important point about the applicable burdens in this area.  The burden to establish

19  directorial interest or lack of independence is squarely on plaintiffs:  "To be clear, a director is

20  *presumed* to be faithful to the corporation and able to objectively consider a demand."  *MIPS*, 2008

21  WL 131915, at *7 (emphasis added).  Plaintiffs here erroneously try to shift that burden to the

22  company and its directors, contending, for example, that "[t]here is no reason to believe that those

23  members of the Board of Directors who are not alleged to have participated directly in the

24  wrongdoing described herein are sufficiently independent to prosecute this action."  Com. ¶ 127.

25  But the company is not required to supply "reasons to believe" that its directors can act impartially.

26

27       [9] In *Zoran*, the single case in which this Court determined that demand was excused, a
    majority of the directors had received misdated options.  511 F. Supp. 2d at 1008-09.  Plaintiffs do
28  not even attempt to allege that this was the case here.

NOTICE OF MOTION, MOTION TO DISMISS AND MEM. OF P'S AND A'S
MASTER FILE NO. C-06-07185-PJH

Controlling law imposes a *presumption* that they can do so. It is plaintiffs who must furnish "reasons" that would overcome this presumption, and who must do so by means of particularized facts. Plaintiffs fail to carry that burden here.

**B.   Plaintiffs Fail To Establish Demand Futility With Respect To The Monthly Grants To Employees.**

Under Delaware law, courts do not assess directorial interest and lack of independence in a vacuum, but rather by reference to particular transactions or groups of transactions. *Desimone*, 924 A.2d at 938-48 (separately analyzing demand futility in connection with option grants made to employees, officers and outside directors). Plaintiffs' demand futility allegations in this case appear to be directed primarily at the monthly grants made to a broad group of Autodesk employees; this is also the category of grants associated with the largest compensation expense by far recognized in the company's restatement. Ex. A at 35. Plaintiffs' description of these grants is patterned entirely on the facts set forth in the company's Form 10-K. That filing, again, plainly concedes that grant dates were "selected by an administrative process to coincide with low trading prices during the month of the applicable grant." *Id.* at 33. The question here, however, is not whether backdating occurred but whether a majority of the company's board members face a substantial likelihood of liability in connection with the relevant transactions. Autodesk's Form 10-K answers that question just as plainly. There is no suggestion that *any* director *received* the options in question: The options were granted to employees, not directors. Nor, with the exception of the single management director, former CEO Carol Bartz, is there any allegation that any director played any role in *granting* the options in question: The authority to make the grants was delegated by the board to the CEO, and the grant dates were then selected by an administrative process. On these facts, plaintiffs have failed to raise a reasonable doubt as to the impartiality of nine of the relevant ten board members.

Plaintiffs seek to overcome that result by contending that both the Compensation Committee and the Audit Committee were implicated in the problematic grants, and that seven of the nine directors served on one or both committees between 1996 and 2006. These assertions cannot carry the day.

11

1.      **Plaintiffs Cannot Tie The Compensation Committee Members To The Challenged Grants.**

Plaintiffs allege that five directors – Bertelsen, Beveridge, Dawson, Halvorsen and Wangberg – each served at some point on the Compensation Committee, and that by virtue of this service, these directors "kn[ew] of, or recklessly disregarded" the misdating of employee stock options.  Com. ¶ 62.  Somewhat contradictorily, plaintiffs also allege that these directors "abdicated" their responsibilities with respect to employee grants.  *Id.* ¶ 58.  But plaintiffs cite to nothing in the company's Form 10-K and nothing in the stock option plans that suggests that the Compensation Committee had any authority over those grants.  In fact, the Form 10-K shows that the opposite was true:  Autodesk's board delegated authority over *officer* grants to the Compensation Committee, but delegated authority over *employee* grants to the CEO, who acted as a committee of one in connection with these grants.  Ex. A at 35.  Indeed, plaintiffs themselves more than once concede this point.  Com. ¶¶ 3, 56 (alleging that "the Board had delegated Defendant Bartz authority to issue options as a 'committee of one' on the condition that the options comply with standard guidelines previously approved by the Board").  As noted above, this allocation of responsibility comports with both federal securities law and the realities of corporate decision making.  *Supra* at 6-7.

In the face of these facts, which *divorce* the Compensation Committee members from the very grants to which plaintiffs seek to tie them, plaintiffs rely on the following statement in the Compensation Committee's charter:

> [The purpose of the Committee is] to ensure the Company has programs in place to attract, retain, and develop a highly effective *management team* and to discharge the Board's responsibilities relating to certain compensation matters of the Company, specifically as regards the approval of compensation for the Company's *executive officers*, and for *certain other Human Resource policies and programs*.

Com. ¶ 59 (emphasis added).  Nothing in this provision suggests that the phrase "certain other Human Resource policies and programs" encompasses the mechanics of granting options to rank-and-file employees.  Indeed, the two explicit references to *executive* and *management* compensation suggest exactly the opposite:  that consistent with the description in the Form 10-K, the Compensation Committee had authority over officer grants, while employee grants were handled by

NOTICE OF MOTION, MOTION TO DISMISS AND MEM. OF P'S AND A'S
MASTER FILE NO. C-06-07185-PJH

the CEO and company staff through an administrative process.  To conclude otherwise – to infer, as

plaintiffs would, that the general reference to "certain" policies and programs means that the

Compensation Committee had authority to manage the mechanics of grants to employees – is to

engage in precisely the kind of speculation forbidden by both the Supreme Court and this Court.

*Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007) (even under notice pleading standard,

allegations must rise "above the speculative level" and do more than merely "create a suspicion" of

wrongdoing); *MIPS*, 2008 WL 131915, at *8 (applying *Bell Atlantic* to reject boilerplate allegation

that the Compensation Committee made and approved problematic grants to employees, where the

company's internal investigation had concluded that this authority was instead delegated to

management).  The single generic reference in the charter simply will not bear the weight plaintiffs

attempt to put on it.[10]

   In any event, even if plaintiffs could successfully allege that the Compensation Committee

had some authority over employee grants, that would be a very far cry from establishing that the

members of the committee lacked independence in connection with those transactions.  The law in

this District is very clear that unless plaintiffs can plead *specific facts* tying Compensation

Committee members to challenged practices, plaintiffs have not overcome the presumption of

directorial independence.  Again and again in its recent decisions, this Court has rejected plaintiffs'

attacks on the independence of Compensation Committee members, even where plaintiffs have

been able to allege that the committee had authority over some or all of the grants in question.  And

this is because in this Court's other recent cases, as here, plaintiffs' allegations have been based on

committee membership alone rather than on particular facts showing involvement in or knowledge

---

[10] Plaintiffs separately attempt to link a single director, Mark Bertelsen, to the employee grants by noting that Wilson Sonsini Goodrich & Rosati, the law firm of which Bertelsen is a partner, served as corporate counsel for Autodesk. Com. ¶¶ 23, 88. Despite their conclusory insinuations, however, what plaintiffs fail to plead are *facts* even suggesting that any Wilson Sonsini attorney, much less Bertelsen, was involved in establishing the administrative procedures governing grants to Autodesk employees. Plaintiffs therefore have not shown that Bertelsen faces a substantial likelihood of liability or is otherwise less than independent and disinterested with respect to these grants. Plaintiffs' suggestion that the Audit Committee's investigation, which was conducted by an independent law firm, was somehow compromised by Bertelsen's presence on the board, *id.*, fails for the same reason.

NOTICE OF MOTION, MOTION TO DISMISS AND MEM. OF P'S AND A'S
MASTER FILE NO. C-06-07185-PJH

of the practices in question.  *E.g.*, *CNet*, 483 F. Supp. 2d at 965 (granting demand motion, and explaining that "[t]he compensation committee had a duty to administer the options plan, but they may not have made every single decision in granting options.  Because of this, merely alleging that directors were members of the compensation committee does not demonstrate that they were not disinterested on these facts"); *Verisign*, 531 F. Supp. 2d at 1193-94 (granting demand motion despite plaintiffs' allegations that the compensation committee "set the policies" that made backdating possible and was "responsible for setting salaries and other compensation of the executive officers, and administering the stock option and other employee equity and bonus plans"; court determines, *inter alia*, that allegations are "only conclusory," and thus "wholly insufficient to support a claim of demand futility"); *Finisar*, 2008 WL 131867, at *13 (rejecting argument that directors who served on audit and compensation committees lacked independence; "plaintiffs' complaint is devoid of any factual allegations of which directors approved which backdated employee grant and whether the directors knew the options were backdated"); *MIPS*, 2008 WL 131915, at *10 ("mere service on the options granting committees is insufficient").  The law in other districts is similar,[11] as is the law in Delaware Chancery Court.[12]  Outside the option-dating field, courts have similarly rejected boilerplate allegations of committee membership.[13]  Consistent with all of these cases, this Court should reject plaintiffs' attack on the independence of the directors who served on Autodesk's Compensation Committee.  Because plaintiffs do not and cannot provide specific facts showing that the directors were involved in or knew about the selection of favorable grant dates, plaintiffs' Compensation Committee allegations do not come

---

[11] *In re F5 Networks, Inc. Deriv. Litig.*, 2007 WL 2476278, at *13 (W.D. Wash. Aug. 6, 2007) ("plaintiffs provide no particularized allegations showing that Director Defendants . . . chose the date on which the allegedly backdated options were to be granted or that they knew a grant's true date.  Plaintiffs' allegations that because Director Defendants . . . were on the Compensation Committee and Audit Committee, they must have known, 'do not constitute particularized facts'") (citing and quoting *CNet*, 483 F. Supp. 2d at 966).

[12] *Desimone*, 924 A.2d at 938 (allegation that stock option plan was "'administered by the Compensation Committee' . . . does not suggest in any way that the Compensation Committee was involved in or had knowledge of any backdating").

[13] *E.g.*, *In re Cray Inc. Deriv. Litig.*, 431 F. Supp. 2d 1114, 1128 (W.D. Wash. 2006) ("The relevant case law does not hold that a director is interested merely by virtue of sitting on an Audit Committee while the corporation faces accounting and audit irregularities").

14

close to establishing demand futility.

## 2. Plaintiffs Cannot Tie The Audit Committee Members To The Challenged Grants.

Plaintiffs also allege that six of Autodesk's present or former directors – Bertelsen, Dawson, Halvorsen, Scheid, Taylor and Wangberg – each served at some point on the Audit Committee and are therefore incapable of impartially assessing a demand. Com. ¶¶ 64-72. These allegations share the defects of plaintiffs' Compensation Committee allegations. Rather than providing specific facts supporting their contention that these directors "knew or recklessly disregarded that the Company's process was designed to backdate options," Com. ¶ 72, plaintiffs rely on boilerplate allegations setting forth the duties of audit committees, and deriving from those duties the conclusion that the committee members must be responsible for errors in financial reporting. Com. ¶¶ 69-72, 106, 108, 110.

If anything, plaintiffs' Audit Committee allegations are weaker as a substantive matter than their Compensation Committee allegations. Plaintiffs' attack on the Audit Committee's members is based on an alleged failure to "monitor" the company's financial reporting. Com. ¶¶ 65-67, 79-81. But as the Delaware Chancery Court has recently emphasized, this so-called *Caremark* theory is very difficult to prevail on, and requires plaintiffs to establish that a director acted in bad faith. *Desimone*, 924 A.2d at 935 (citing *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996)). Plaintiffs have not come close to establishing bad faith here. They have shown only that Autodesk's financial statements contained errors – the premise of a restatement. But "the fact that [the company] accounted for the backdated option grants incorrectly does nothing to suggest any conscious wrongdoing on the part of the Audit Committee and is consistent with the notion that the Audit Committee was simply ignorant of any backdating." *Desminone*, 924 A.2d at 942 (concluding that deficient allegations concerning Audit Committee members fail to state a claim "under the stringent *Caremark* standard"); *MIPS*, 2008 WL 131915, at *9 (same; citing and quoting *Desimone*). Because plaintiffs do little more than observe that the company issued a restatement, they have not established that the Audit Committee members face a "substantial likelihood of liability" in connection with either the granting of options or the accounting for those grants –

15

1   particularly when it is recalled that the directors are entitled to the protection of the exculpatory

2   provision in the company's Articles of Incorporation. *Supra* at 9.

3       Plaintiffs also point out that the Audit Committee was responsible for conducting

4   Autodesk's internal investigation, and they contend that the committee's handling of the

5   investigation shows a lack of independence. Com. ¶¶ 84-89. Plaintiffs are particularly critical of

6   the company's former CEO, Carol Bartz, and allege that the conclusions the Audit Committee

7   reached regarding her role in option granting practices are open to "serious doubt." Com. ¶ 82.

8   Precisely this kind of argument was made to – and rejected by – the Delaware Chancery Court in

9   one of its major option-dating cases:

10      [Plaintiff] complains that [the] board conducted an ineffectual investigation of the
        stock option practices . . . . Likewise, he claims that the board has been too soft on
11      [executives and employees] who were directly responsible for the wrongdoing.
        [Plaintiff] contends that the limited scope of the internal investigation and the
12      board's failure to require the recipients of backdated options to disgorge or reprice
        them amounts to a breach of fiduciary duty by [the company's] board. On this basis,
13      he says his complaint should go forward even if his more direct attacks on the option
        grants should be dismissed.
14

15  *Desimone*, 924 A.2d at 950. In reasoning that applies equally here, Vice Chancellor Strine

16  explained forcefully in *Desimone* why such an attack must fail.

17      *First*, as the Vice Chancellor explained, an attack on the board's internal investigation is

18  improper in the context of a demand futility argument, which depends on the premise that the

19  plaintiff has necessarily *abandoned* the board as a vehicle for righting the wrongs complained of:

20  "A derivative plaintiff cannot fail to make a demand on the basis that demand is excused, fail to

21  meet his burden to plead demand excusal, and then try to preserve his right to proceed by arguing in

22  essence that the board wrongfully refused a demand that he never made." *Id.* Plaintiffs here

23  criticize the Audit Committee's conclusions, and suggest that they themselves may have pursued a

24  different course of action, and dealt more harshly with employees or executives involved in the

25  company's option granting processes, if they had been in charge. But shareholders, of course, do

26  not have the power to make decisions for the corporation, and the fact that they disagree with the

27  board's handling of a particular transaction does not mean that they are entitled to substitute their

28  own judgment for that of the board. This is as true in the area of resolving potential claims against

16

NOTICE OF MOTION, MOTION TO DISMISS AND MEM. OF P'S AND A'S
MASTER FILE NO. C-06-07185-PJH

management or employees as it is in any other.  *See, e.g., White v. Panic*, 783 A.2d 543, 550 (Del. 2001) (plaintiff's disagreement with board's decision not to sanction CEO in connection with sexual harassment claims by employees does not establish demand futility).  A shareholder – or even a majority of shareholders – made unhappy by a decision of the board may wish to begin the process of changing company policy by deciding to vote against board members at the next opportunity.  But a shareholder may not simply bypass that process by installing himself or herself as the new corporate decision maker, at the expense of the directors duly elected by a majority of the shareholders.

 *Desimone*'s second reason for rejecting plaintiff's attack on the internal investigation carried out by a board committee also applies here as well as it did in that case.  The *Desimone* court noted that plaintiff's criticism of the committee's work in that case was sorely lacking in particularized facts concerning what the board discussed, what conclusions it reached and why it did or did not take particular actions.  *Id.* at 951.  The same is true here.  Plaintiffs complain, for example, that the Audit Committee's conclusions "obfuscate" conditions at the company, and that the committee's report "fails to provide any explanation" of certain facts and "notably avoids" certain others.  Com. ¶¶ 84, 86, 87.  In other words, plaintiffs largely concede that they are ignorant of the very facts they wish to rely on to impugn the Audit Committee's processes.  Their attack on the investigation thus falls far short of establishing that the members of the committee lacked independence.

 **C.** **Plaintiffs Fail To Establish Demand Futility With Respect To Any Other Grants.**

 In addition to the broad-based employee grants, plaintiffs briefly mention three other categories of grants discussed in Autodesk's Form 10-K.  Com. ¶¶ 98-99.  Two of the three categories are confined to grants made in 1992, five years before the start of the so-called "Backdating Period" on which plaintiffs' claims are based.  *Id.* ¶ 2.  Plaintiffs clearly cannot show a substantial likelihood of liability in connection with conduct that does not form the basis for any of their claims.  Plaintiffs' allegations also reveal that at most three of the relevant ten directors sat on Autodesk's board in 1992.  *Id.* ¶¶ 22-29.  It is therefore a logical and chronological impossibility for plaintiffs to show that a majority of the board was interested or lacking in independence with

17

respect to the two 1992 transactions.

The third category includes a total of seven grants made over a three-year period; the aggregate non-cash adjustment in connection with these grants is $600,000. Com. ¶ 98. The company explained the issues with these grants succinctly:

> (i) two individual option grants do not appear to have any evidence of Compensation Committee approval or authorization; (ii) four additional individual option grants appear to have been ratified at a date subsequent to the original grants date; and (iii) the original measurement date of one additional option grant approved by a Unanimous Written Consent of the Compensation Committee appears to have been made more than a reasonable period of time prior to final approval of the grant for accounting purposes.

*Id.* (quoting Form 10-K). Plaintiffs do not provide any additional facts relating to these grants, and certainly nothing suggesting that the errors in connection with the seven grants were anything other than innocent.[14] Plaintiffs therefore have not demonstrated that *any* person faces a substantial likelihood of liability in connection with these grants, much less that any of the directors does. Thus with respect to these earlier grants, as with the employee grants made between 2000 and 2005, plaintiffs fail entirely to show that a majority of the relevant ten directors are interested or lacking in independence.

**D.      Plaintiffs' Additional Boilerplate Allegations Do Not Establish Demand Futility.**

Finally, in a separate section of their complaint, plaintiffs set forth a series of generic demand futility allegations largely unmoored from any of the transactions at issue here. Com. ¶¶ 119-28. None of these allegations satisfies plaintiffs' burden to establish interest or lack of

---

[14] This Court has recognized that companies can and do make errors in granting and accounting for stock options without in any way intending to select favorable exercise prices:

> The Office of the Chief Accountant of the SEC has stated that the accounting treatment of stock options admits the possibility of innocent error. Not each and every single instance where a company has chosen the wrong measurement date is necessarily a case of backdating. Use of an incorrect measurement date for stock options could be the result of innocent but sloppy accounting practices rather than a fraudulent effort to retrospectively change grant dates. The Office of the Chief Accountant recognized that determining the correct measurement date is a fact-specific endeavor. So too is pleading with specificity that stock options were backdated.

*Zoran*, 511 F. Supp. 2d at 1003-04 (citation omitted).

NOTICE OF MOTION, MOTION TO DISMISS AND MEM. OF P'S AND A'S
MASTER FILE NO. C-06-07185-PJH

independence by means of particularized facts.  Many of the allegations are simply variations on the theme of "they won't sue themselves," which, as discussed above, has long been found to be an insufficient basis to establish demand futility.  *Supra* at 8 (citing authorities); Com. ¶ 119(a) (directors "would have to be named as defendants . . . which they would not do"); ¶ 122 (stating purported basis for claims against directors); ¶ 124 (same); ¶ 125 (because of lack of insurance coverage, directors "will not cause the Company to sue themselves or their business associates and friends").[15]

Plaintiffs also fall back on such standard-issue items – long found to be inadequate – as the observation that the directors were paid fees for their services (¶ 126) and the assertion that the alleged wrongdoing was incapable of ratification (¶ 123).  Under governing law, these chestnuts get plaintiffs exactly nowhere.  *E.g., Lewis v. Sporck,* 612 F. Supp. 1316, 1322-23 (N.D. Cal. 1985) ("The contention that demand is futile because the acts complained of are illegal and, therefore, incapable of ratification misses the point of the demand requirement.  Ratification is not the only option; the board must be given a fair opportunity to decide whether the corporation itself should bring the suit"); *In re E.F. Hutton Banking Practices Litig.*, 634 F. Supp. 265, 271 (S.D.N.Y. 1986) ("Receipt of director's fees does not suggest a conflict of interest.  If it did, every director who receives a director's fee would [be] biased").[16]  And while plaintiffs refer to "disabling social and business relationships" among the directors (Com. ¶¶ 119(b), 128), they do not so much as hint at what those relationships might be, which makes this allegation patently inadequate as well.  *E.g., Beam v. Stewart*, 845 A.2d 1040, 1051-52 (Del. 2004) ("[m]ere allegations that [directors] move in the same business and social circles . . . [are] not enough to negate independence"); *Verisign*, 531 F. Supp. 2d at 1197 (same).

---

[15]  The law is clear that this last allegation in particular is simply a failed recasting of the "won't sue themselves" formula.  *E.g., Caviness v. Evans*, 229 F.R.D. 354, 360 (D. Mass. 2005) (insurance allegations "unavailing" because they are "nothing more than variations on the 'directors suing themselves' and 'participating in the wrongs' refrain") (internal quotations and citations omitted).

[16]  Plaintiffs observe that the directors were also granted stock options in connection with their board service, Com. ¶ 126, but they do not and cannot allege that any of these options were backdated.

NOTICE OF MOTION, MOTION TO DISMISS AND MEM. OF P'S AND A'S
MASTER FILE NO. C-06-07185-PJH

Plaintiffs' remaining allegations, while somewhat more tailored to option-dating litigation, have also been found to be inadequate in this context.  Plaintiffs complain that any director who did not himself or herself participate in the purported wrongdoing nevertheless "ratified" it (Com. ¶ 127), but this Court has consistently rejected such conclusory allegations of ratification (which, incidentally, also appear to contradict plaintiffs' boilerplate assertion that the acts complained of are *incapable* of being ratified).  *CNet*, 483 F. Supp. 2d at 963-64; *Verisign*, 531 F. Supp. 2d at 1193. Finally, plaintiffs rerun their critique of the Audit Committee's investigation and conclusions (Com. ¶¶ 120-21); for the reasons stated above, however, such allegations run counter both to the basic structure of the demand requirement and to the rule that plaintiffs must establish demand futility by means of specific allegations.  *Desimone,* 924 A.2d at 950-51; *supra* at 16-17.  In short, because none of plaintiffs' allegations establishes demand futility, the complaint should be dismissed.

### E.   Plaintiff Giles Lacks Standing To Pursue Derivative Claims And Plaintiff Peach's Pleading Regarding Standing Is Inadequate.

Whether or not the Court dismisses the complaint in its entirety, it should dismiss plaintiff Giles from this action.  To have standing, a derivative plaintiff must have been a shareholder at the time of the transactions of which he or she complains.  Fed. R. Civ. P. 23.1.  In an option-dating case, this means that "[p]laintiff cannot assert claims based on grants occurring before he acquired his stock." *Zoran*, 511 F. Supp. 2d at 1010; *see also Verisign*, 531 F. Supp. 2d at 1202 ("A derivative plaintiff has no standing to challenge option transactions that occurred prior to the time that plaintiff owned company stock").[17]  Plaintiff Giles, by his own admission, did not become an Autodesk shareholder until January 2006, *after* the last of the challenged option grants was made. Com. ¶¶ 19, 53.  Because Giles lacks standing to pursue any of the claims at issue here, he should be dismissed from this action.

Plaintiff Nancy Peach states that she "or her legal predecessor has held Autodesk shares continuously since 1998."  Com. ¶ 20.  This allegation is insufficient.  This Court has made clear

---

[17] The result under Delaware law is the same.  *Desimone*, 908 A.2d at 924-27 (dismissing claims based on grants that predated plaintiff's stock ownership, and rejecting plaintiff's argument that the "continuing wrong" doctrine enables him to reach such grants); *Ryan v. Gifford*, 918 A.2d at 358-59 (dismissing claims based on grants predating plaintiff's stock ownership).

NOTICE OF MOTION, MOTION TO DISMISS AND MEM. OF P'S AND A'S
MASTER FILE NO. C-06-07185-PJH

that plaintiffs must plead the facts concerning derivative standing in greater detail:  Namely, they

must "unambiguously indicate . . . the dates they purchased [the company's stock], and whether

they have continuously owned [the] stock from the time of purchase up to the present."  *Verisign*,

531 A.2d at 1202.  If the Court dismisses the complaint on demand futility grounds but grants leave

to amend, Peach should be required, in any amended complaint, to plead (and verify) the facts

concerning her "legal predecessor" allegation, and to specify the manner in which she came to hold

her Autodesk stock.   Only in this way may the parties and the Court ascertain whether or not Peach

has standing to pursue the claims she purports to bring.

**IV.   CONCLUSION**

      For the reasons stated above, this Court should dismiss the complaint in its entirety.

Dated:  April 22, 2008               Respectfully submitted,
                                     HELLER EHRMAN LLP

By:_____
          Norman J. Blears
Attorneys for Nominal Defendant
AUTODESK, INC.

SE 2246284 v2
4/22/08 10:37 AM (44177.0001)

NOTICE OF MOTION, MOTION TO DISMISS AND MEM. OF P'S AND A'S
MASTER FILE NO. C-06-07185-PJH