UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re AUTODESK, INC., SHAREHOLDER DERIVATIVE LITIGATION<br>_____<br>THIS ORDER RELATES TO:<br>ALL ACTIONS<br>_____/ | No. C 06-7185 PJH<br><br>**ORDER GRANTING MOTION TO DISMISS** |

The motion of nominal defendant Autodesk, Inc., to dismiss the first amended complaint for lack of subject matter jurisdiction came on for hearing before this court on September 17, 2008. Plaintiffs appeared by their counsel Matthew R. Chasar and Juli E. Farris; and Autodesk, Inc., appeared by its counsel Sarah B. Brody and Robin E. Wechkin. Having read the parties' papers and carefully considered their arguments and good cause appearing, the court hereby GRANTS the motion.

**INTRODUCTION**

This is a shareholder derivative action on behalf of Autodesk, Inc. ("Autodesk" or "the Company"), against certain current and former Autodesk officers and directors. Named plaintiffs James Giles and Nancy Peach allege that these officers and directors ("the individual defendants") granted millions of dollars' worth of backdated options from 1997 through 2005 ("the backdating period"), in violation of federal securities laws and Delaware state law.

The individual defendants are Carol A. Bartz ("Bartz"), currently the Executive Chairman of Autodesk's Board of Directors, and who formerly served as President and CEO of the Company; Mark Bertelsen ("Bertelsen"), a director of the Company since 1992; Crawford W. Beveridge ("Beveridge"), a director of the Company since 1993; J. Hallam

Dawson ("Dawson"), a director of the Company since 1988; Per-Kristian Halvorsen ("Halvorsen"), a director of the Company since 2000; Steven L. Scheid ("Scheid"), a director of the Company from 2002 to May 2007; Mary Alice Taylor ("Taylor"), a director of the Company from 1997 to May 2007; and Larry W. Wangberg ("Wangberg"), a director of the Company from 2000 to June 2008.

Bertelsen, Beveridge, Dawson, Halvorsen, and Wangberg were members of the Compensation Committee at various times and are referred to collectively as the "Compensation Committee defendants." Bertelsen, Dawson, Halvorsen, Scheid, Taylor, and Wangberg were members of the Audit Committee at various times, and are referred to collectively as the "Audit Committee defendants."

Plaintiffs allege that Bartz granted most of the backdated options, and that she acquired the authority to do so in December 1995 when Autodesk's Board delegated to her the authority to issue options as a "committee of one" on the condition that the options comply with standard guidelines previously approved by the Board. They claim that in granting the backdated options, Bartz engaged in a scheme to deceive Autodesk and the investing public, in violation of § 10-b of the 1934 Securities Exchange Act, and Rule 10b-5 promulgated thereunder.

Plaintiffs assert further that the director defendants systematically failed to monitor Bartz' use of the Board's powers between December 1996 and February 2005. They claim that this prolonged failure not only constituted a breach of fiduciary duty, but also contradicted the Board's express representations to shareholders in public filings regarding the administration of the employee stock plan at issue and the directors' oversight of the Company's affairs.

Plaintiffs allege that in furtherance of the backdating scheme, defendants improperly reported and accounted for stock option grants, in violation of Generally Accepted Accounting Principles. Plaintiffs claim that as a result of this extensive backdating, the Company was forced to restate its financial results for fiscal years 2003, 2004, 2005, and 2006. Based on the revised measurement dates for the previously backdated grants, the

Company was forced to recognize a pre-tax charge of $34.8 million, $21.7 million of which is attributable to backdating grants for fiscal years 2003 through 2006.

Thus, plaintiffs assert, Autodesk's publicly reported financial results were inaccurately reported, and contained materially false and misleading statements and information concerning the backdated option grants and the Company's financial condition. Plaintiffs allege that this dissemination of materially false and misleading information to Autodesk shareholders, in the form of proxy solicitations, violated § 14(a) of the 1934 Securities Exchange Act, and Rule 14a-9 promulgated thereunder.

The original complaint in this action was filed on November 20, 2006. A second action was filed on December 29, 2006. Pursuant to stipulation, the two cases were ordered related and consolidated on January 12, 2007. Following several continuances, the Amended Verified Derivative Complaint ("FAC") was filed on December 3, 2007.

The FAC alleges four causes of action – (1) violation of Exchange Act § 14(a) and rule 14a-9, against the individual defendants; (2) violation of Exchange Act § 10(b), and Rule 10b-5, against Bartz; (3) breach of fiduciary duty, against the individual defendants; and (4) waste of corporate assets, against the individual defendants.

Autodesk now seeks an order dismissing the FAC pursuant to Federal Rules of Civil Procedure 12(b)(6) and 23.1 for failure to make a pre-suit demand and failure to plead facts demonstrating demand futility.

**BACKGROUND**

Autodesk is a software design company that serves customers in architecture, engineering, manufacturing, and other markets. On August 17, 2006, Autodesk announced that its Audit Committee was conducting a voluntary review of the Company's historical stock option granting practices, together with accounting issues related to those practices. FAC ¶ 42 (citing Press Release, "Autodesk Reports Record Revenues of $450 Million," attached as Exh. 99.1 to Form 8-K, filed August 17, 2006). The Audit Committee hired independent outside legal counsel and forensic accountants assist in the review. Id.

Over the next several months, the Audit Committee investigated the Company's

option granting practices going back to 1988, examining the facts and circumstances surrounding more than 230 separate option grant approvals made between January 1988 and August 2006, and interviewing more than 40 witnesses and examining over 700,000 documents. See Autodesk's Form 10-K for fiscal year ending January 31, 2007, dated June 4, 2007 ("2007 Form 10-K"), at 33.

Within two months, the investigation had identified the existence of backdated employee stock option grants. On October 6, 2006, Autodesk issued an update on the review, stating that the Audit Committee had preliminarily concluded that "the actual measurement dates for financial accounting purposes of certain broad-based employee stock option grants issued in the past differ[ed] from the recorded grant date of such awards," and that the Company would likely record additional non-cash, stock-based compensation expense related to stock option grants. FAC ¶ 43 (citing Press Release, "Autodesk Announces Update on Stock Options Review," attached as Exh. 99.1 to Form 8-K filed October 6, 2006).

Approximately seven weeks later, while the Audit Committee was still engaged in the process of reviewing the stock option grants, plaintiff James Giles filed the initial complaint in the present action, in which he alleged that nearly all the Company's then-directors had breached their fiduciary duty in connection with the issuance of option grants, and had violated federal securities laws. This complaint was followed five weeks later by a second federal action filed by plaintiff Nancy Peach. In addition, a shareholder derivative action was filed in Marin County Superior Court in January 2007.[1]

In February 2007, the Audit Committee completed its review and submitted its report to Autodesk's Board. In June 2007, the Company filed the Form 10-K for fiscal year ending January 31, 2007, which included restated financial statements for fiscal years 2003-2006, and explained in detail both the reasons for the restatement and the results of the stock option investigation. 2007 Form 10-K, at 3-4, 33-38, 85-89.

---

[1] The Marin County Superior Court subsequently stayed that action pending the court's ruling in this action.

4

1  The Company acknowledged that errors had been made with regard to the granting
2  of options. For example, the Company noted that

> [b]etween July 2000 and February 2005, the Company made monthly broad-based employee grants pursuant to authority delegated by the Board to the CEO, where the grant dates for most of those broad-based grants were selected by an administrative process to coincide with low trading prices during the month of the applicable grant.

6  Id. at 33. The Company disclosed that one new-hire grant made to an officer in 1992 had
7  been measured using an incorrect measurement date, discussed measurement date errors
8  in seven grants made between 1997 and 2000, and also mentioned additional problems
9  under the headings of "Anomalous Add Grants" and "Board-Authorized Grant." Id. at 35-
10 36. In order to address the accounting issues that had arisen because of these and other
11 discoveries, the Company announced that it was restating its financial statements to take
12 non-cash compensation charges totaling $34.5 million over an 18-year period.

13  The Company made clear in its accounting restatement that the problems it had
14 discovered were limited in certain significant ways. The Company found no evidence that
15 any officer or director backdated any stock option granted to himself/herself; and that
16 based on the evidence accumulated during the review, it was unlikely that those involved in
17 the measurement date errors understood the accounting impact of their actions, or that
18 they intended to misstate the Company's financial statements; and that there was no
19 evidence of any measurement date error involving any stock option grant made to a person
20 serving as a director. Id. at 33-34.

21  Following these disclosures, plaintiffs amended the complaint in the present action,
22 and incorporated the Company's own findings into renewed accusations of fiduciary breach
23 and violations of securities laws.

24  Plaintiffs assert that the Company's 1996 Stock Plan ("the 1996 Plan") permitted the
25 issuance of incentive stock and non-statutory stock options to employees, FAC ¶ 46; that
26 the 1996 Plan required that the exercise price for shares issued pursuant to the exercise of
27 an option "shall be no less than 100% of the Fair Market Value per Share on the date of the
28 grant," FAC ¶ 49; and that despite the Plan's terms, the Company established an

5

"administrative process" designed to provide "in the money" options to grant recipients, which process resulted in effective grant dates that were "prior in time to the final preparation of action by written consent for such grants . . . to coincide with low trading prices during the month of the applicable grant," FAC ¶ 53 (citing 2007 Form 10-K).

Plaintiffs allege further that the existence of this "administrative process" was not disclosed to shareholders or reflected in the Company's accounting for stock option grants, FAC ¶ 54; that the "manipulation" of the option grants was directed by Bartz, FAC ¶ 56, exercising powers delegated by the Board, FAC ¶¶ 73-76; that this backdating process reflected the Compensation Committee defendants' abdication of their responsibilities under the Compensation Committee charter, FAC ¶ 59; and that the Audit Committee, which was responsible under its charter for monitoring the Company's financial reporting, failed to ensure that the Company's financial results properly accounted for the issuance of discounted stock option grants, FAC ¶¶ 65-70.

Autodesk argues that the action must be dismissed because plaintiffs failed to make a pre-suit demand on the Board of Directors, and failed to allege with particularity that Autodesk's Board was incapable of acting impartially and independently had they been presented with a pre-suit demand.

**DISCUSSION**

A.   Legal Standard

A shareholder does not have standing to sue in an individual capacity for injury to the corporation. William Meade Fletcher, et al., 13 Fletcher Cyc. Corp., § 5939 (2008). Such an action must be brought as a derivative action – "an equitable remedy in which a shareholder asserts on behalf of a corporation a claim not belonging to the shareholder, but to the corporation." Id. Once the action – if filed in federal court – has been characterized as direct or derivative, the applicable procedural rules are determined by federal law. Sax v. World Wide Press, Inc., 809 F.2d 610, 613 (9th Cir. 1987).

Federal Rule of Civil Procedure 23.1 permits a plaintiff to bring a shareholder derivative suit if two requirements are met. Potter v. Hughes, 546 F.3d 1051, 1056 (9th Cir.

6

2008).  First, the plaintiff must have owned shares in the corporation at the time of the disputed transaction.  See Fed. R. Civ. P. 23.1(b)(1).  Second, the plaintiff must "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1(b)(3).  The failure to meet the demand requirement may be excused if the particularized facts show that demand would have been futile.  See In re Silicon Graphics, Inc., Sec. Litig., 183 F.3d 970, 989-90 (9th Cir. 1999).

There is no dispute in the present action that plaintiffs did not make a demand on the Board before filing the present action.  "The demand requirement is governed by federal law in derivative suits founded on a federal statute.  But federal courts generally 'borrow' the state law that governs the affairs of the corporation in determining whether a shareholder demand is prerequisite to a shareholder suit."  Schwarzer, Tashima & Wagstaffe, Federal Civil Procedure Before Trial (2008 ed.) § 10:962.6 (citing Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991)).  Thus, because Autodesk is a Delaware corporation, Delaware law governs the issue of whether plaintiffs' failure to make a pre-suit demand on Autodesk's Board is excused.

Delaware law provides two demand-futility tests, as set forth in Aronson v. Lewis, 473 A.2d 805 (Del. 1984), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000); and Rales v. Blasband, 634 A.2d 927 (Del. 1993).  The Rales test and the first prong of the Aronson test are the same – the court looks at whether the plaintiff has established, by means of particularized factual allegations, that a majority of the board (as of the time the complaint is filed) is interested or is lacking in independence.  Aronson, 473 A.2d at 814; Rales, 634 A.2d at 934.

The second prong of the Aronson test requires the plaintiffs to establish that a challenged board action was not the product of a valid exercise of business judgment.  Aronson, 473 A.2d at 814.  This second prong can be applied only where the plaintiff is challenging an action of the whole board.  When, however, the board members who

approved the challenged act have since changed, or when (as here) the plaintiffs do not challenge a business decision by the board, a court should employ the Rales test. As the Rales court explained,

> [T]he right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation.

Rales, 634 A.2d at 932.

B.  Motion to Dismiss

Autodesk seeks an order dismissing the FAC on the ground that plaintiffs failed to make a demand on the directors prior to filing suit on November 20, 2006, and that the FAC fails to allege demand futility with particularity as required by Federal Rule of Civil Procedure 23.1.

As indicated above, demand futility is analyzed under the Rales test based on the composition of the board at the time the lawsuit is initiated, as that is the board on which demand would be made. Harris v. Carter, 582 A.2d 222, 228 (Del. Ch. 1990); see also Braddock v. Zimmerman, 906 A.2d 776, 786 (Del. 2006). When the present action was commenced on November 20, 2006, Autodesk's Board consisted of ten directors: Bartz, Carl Bass ("Bass"), Bertelsen, Beveridge, Dawson, Michael Fister ("Fister"), Halvorsen, Scheid, Taylor, and Wangberg.

Directors are presumed to be faithful to the corporation and able objectively to consider a demand. See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845 A.2d 1040, 1048 (Del. 2004). Autodesk argues that the fact that it publicly disclosed all its unfavorable findings in the 2007 Form 10-K demonstrates that the Board of Directors as a whole, and the Audit Committee in particular, were entirely capable of acting impartially and independently, and were also capable of exposing problems, both at the management and the Board levels.

To plead that demand would have been futile, plaintiffs must allege facts establishing the self-interest or lack of independence of a majority of those directors,

1  showing, with particularity, why the presumption does not apply as to at least six directors
2  as of November 20, 2007.  See id. at 1048-49.  Autodesk asserts that plaintiffs cannot
3  establish demand futility because they cannot tie the members of the Audit Committee or
4  the members of the Compensation Committee to the challenged grants.

5  Autodesk also contends that plaintiffs have not established demand futility with
6  regard to any grants other than the broad-based employee grants discussed above; that
7  the remaining allegations in the FAC do not establish demand futility; and that plaintiff Giles
8  lacks standing, and that plaintiff Peach's pleading of standing is inadequate.

9  In opposition, plaintiffs argue that demand futility is established by allegations that
10 the Audit Committee defendants failed to take corrective action for admitted backdating,
11 and produced and published a biased report of the investigation.  They also assert that
12 demand futility is established by allegations that Bartz and the members of the Audit and
13 Compensation Committees face a substantial likelihood of liability.  Finally, plaintiffs
14 contend that both named plaintiffs have standing to bring this action.

15 As an initial matter, the court notes that plaintiffs allege demand futility in the FAC in
16 a section headed "Derivative Action and Demand Futility Allegations."  See FAC ¶¶ 119-
17 128.  These allegations are almost wholly generic, and thus, by definition, not
18 "particularized."  Because of the absence of specific facts in this section of the FAC, the
19 court was compelled to search through the entire 40-page FAC in an effort to determine
20 whether plaintiffs had adequately alleged demand futility.  Having performed this review,
21 the court finds that the allegations in the FAC as a whole do not satisfy the pleading
22 requirements of Rule 23.1(b)(3).

23 To take one example, the court understands the "Demand Futility Allegations" to
24 allege that the members of the Board on whom the demand would have been served were
25 "interested" because they "either actively participated in or acquiesced in the behavior
26 complained of," and "cannot and will not prosecute this action against themselves" because
27 they are themselves implicated in the wrongdoing; and to allege that they were lacking in
28 "independence" because each has "disabling social and business relationships with each

9

other and Autodesk's top executives." FAC ¶ 119.  However, a search of the FAC finds no particularized facts alleged that show either that the Board members actively participated in the granting of backdated options, or actively acquiesced in it, or that they had "disabling social and business relationships with each other."

There is no dispute that backdating occurred.  Nevertheless, the question here is whether a majority of the Board's members were involved in the backdating or face a substantial likelihood of liability in connection with the relevant transactions, such that they would have been incapable of impartially considering a demand in November 2007. Plaintiffs allege no facts showing that there is any such likelihood, and the 2007 Form 10-K makes clear that no director received any of the options at issue.  The options were granted to employees, not to directors.  Nor do plaintiffs allege that any director other than Bartz played any role in granting the options in question.  The authority to grant the options was delegated by the Board to the CEO (Bartz), and the grant dates were selected by an administrative process.  Thus, plaintiffs have failed to raise reasonable doubts about the Board members' impartiality.

        1.      Audit Committee Defendants

Plaintiffs assert that Bertelsen, Dawson, Halvorsen, Scheid, Taylor, and Wangberg served at various times on the Audit Committee, and that by virtue of this service they "knew or recklessly disregarded that the Company's process was designed to backdate options," and were therefore incapable of impartially assessing a demand as of November 20, 2007.  FAC ¶¶ 64-72.  Autodesk contends, however, that the FAC pleads no facts tying the Audit Committee members to the challenged grants.

The argument in plaintiffs' opposition that demand on the Audit Committee defendants would have been futile is two-fold.  Plaintiffs contend that demand futility is established by allegations that the Audit Committee defendants conducted an inadequate investigation, produced and published a biased report, and failed to take corrective action for the admitted backdating; and that demand futility is also established by allegations that the Audit Committee defendants face a substantial likelihood of liability for knowingly or

10

recklessly allowing an institutionalized practice of backdating to exist.

Plaintiffs claim that all these allegations, considered together, create a reasonable doubt that the Board in November 2007 was capable of rendering an impartial decision in response to any pre-suit demand. Plaintiffs rely on a recent Delaware case, Conrad v. Blank, 940 A.2d 28 (Del. Ch. 2007), arguing that the facts in the present case are substantially similar to the facts in that case.

        a.      Investigation and report of investigation

First, plaintiffs contend that demand futility is established by allegations in the FAC that the Audit Committee defendants conducted an inadequate investigation, produced and published a biased report of the investigation, and failed to take corrective action for admitted backdating. Plaintiffs cite to allegations that the Audit Committee report regarding the investigation failed to assign any culpability to any particular individuals; failed to recommend any course of action to recover the millions of dollars "diverted from" the Company; failed to address the Audit Committee's own role in failing to monitor Bartz's backdating activities; failed to disclose when and what the Board knew about the "institutionalized practice" of backdating; and failed to evaluate the role played by Wilson Sonsini, the Company's long-time outside counsel, at which defendant Bertelsen is a partner. See FAC ¶¶ 5, 14-17, 19, 82-89, 96, 121, 127.

With regard to the claim that demand would have been futile because the Audit Committee defendants conducted an inadequate investigation and produced a biased report, the court notes at the outset that it is logically inconsistent to argue that a demand on the Board would have been futile in November 2006, where the claim underlying the demand was based on an internal investigation that was still ongoing at the time; and based on a report of that internal investigation, where the report was not issued to the whole Board until February 2007.

Moreover, as the Delaware court noted in Desimone v. Burrows, 924 A.2d 908 (Del. Ch. 2007), an attack on a board's internal investigation is improper in the context of a demand futility argument, because such an argument depends on the premise that the

plaintiff has necessarily abandoned the board as a vehicle for righting the wrongs complained of. See id. at 950.[1]

Nor does the Conrad decision provide support for plaintiffs' position. In that case, a Delaware corporation filed a Form 10-Q detailing the results of an audit committee internal review that revealed incorrect measurement dates for stock option grants. The court found demand futility and lack of disinterestedness based on allegations in the pleadings that the audit committee had failed to explain the conclusions put forth in the 10-Q, and the board of directors failed to take corrective action. Id., 940 A.2d at 31, 34, 37-38. The court also found it significant that the investigation was conducted not by disinterested parties but by the very individuals whose authorization of the option grants was within the province of the inquiry.

The facts in Conrad are easily distinguished from the facts in the present case. The Conrad court did not conclude that the company's directors were interested or lacking in independence because of the way in which the internal investigation was conducted, but rather, found that five members of the ten-member board lacked impartiality because two had received challenged options and three had served on the compensation committee, which had granted those options. Id. at 38-39. Here, by contrast, none of the director defendants received any of the challenged options, and it was not the Compensation Committee that granted the options.

Further, while the Conrad court was critical of certain aspects of the internal investigation, it did not explicitly hold that the audit committee members who had participated in the investigation were for that reason interested or lacking in independence, see id. at 40-41 & n.32, as plaintiffs argue here. Indeed, any other result would be

---

[1] As a second reason for rejecting the attack on the internal investigation, the Desimone court found that the plaintiff's criticism of the committee's work in that case was lacking in particularized facts concerning what the board had discussed, what conclusions it had reached, and why it did or did not take a particular action. Id. at 951. Similarly, in the present case, while plaintiffs complain that the Audit Committee's conclusions "obfuscate" conditions at the Company, and that the Committee's report "fails to provide any explanation" of certain facts and "notably avoids" certain others, see FAC ¶¶ 84, 86, 87, they offer no details of any such facts.

12

incompatible with the existing demand-futility framework, because allowing a plaintiff to establish demand futility by criticizing the results of a board's investigation would permit shareholders to bypass the board's role in evaluating potential claims, and would invite them to substitute their own judgment for the board's refusal of a demand they would never have to make. See Desimone, 924 A.2d at 950.

In addition, while it is true that the Conrad court criticized the company's disclosures in that case, it was because the company did not explain terms such as "incorrect measurement dates" and did not disclose any details on which the company had concluded that no intentional wrongdoing had occurred. Conrad, 940 A.2d at 33-34, 37. Here, by contrast, the disclosures in the Form 10-K were extensive and detailed. See 2007 Form 10-K, at 3, 33-38, 85-93. The disclosures made by the Company here bear no resemblance to the "gross generalities" that the Conrad court criticized in that case.

Moreover, in Conrad, the internal investigation was not conducted by disinterested parties but by the audit committee defendants themselves. In this case, Autodesk's Audit Committee commenced its investigation before the present action was filed, and there were therefore no "Audit Committee defendants" at the time the investigation began. And even if the Audit Committee defendants had been made defendants before the Company commenced its investigation, that would not be cause for concern because the actions being investigated (options backdating) were not actions of the Audit Committee or the Board, but were actions that had been delegated to management by the Board.

Finally, the Conrad court was troubled by the fact that the company and the individual defendants there had joined forces for litigation, were represented by the same law firm, and had both filed motions to dismiss. Those are not factors in this case, as the present motion was filed by the Company alone.

        b.        Likelihood of liability

Plaintiffs assert that demand would also have been futile because the Audit Committee defendants face a substantial likelihood of liability, and are therefore incapable of being disinterested. Specifically, plaintiffs assert that the Audit Committee defendants

13

failed to "monitor" the Company's financial reporting, see FAC ¶¶ 65-72; and that they "allowed" an institutionalized practice of backdating to exist, see FAC ¶¶ 69, 72. They claim that even if the Committee members were unaware that the backdating existed, they will still be liable for failure to oversee Bartz's activities.

However, rather than alleging particularized facts regarding these six directors, the FAC simply provides boilerplate allegations setting forth the duties of Audit Committee members. See FAC ¶¶ 65-72. 106, 108, 110. Nowhere in the paragraphs of the FAC cited by plaintiffs (or anywhere else) are there particularized allegations sufficient to support an assertion of demand futility.

In addition, it is generally difficult for shareholders to prevail on a "failure of oversight" theory of liability in a derivative lawsuit, as it requires a plaintiff to establish that a director acted in bad faith. See Desimone, 924 A.2d at 935. A director is liable for "failure of oversight" type claims where he demonstrates a "lack of good faith as evidenced by a sustained or systematic failure . . . to exercise reasonable oversight," In re Caremark Int'l Inc. Deriv. Litig., 698 A.2d 959, 971 (Del. Ch. 1996), or an intentional failure "to act in the face of a known duty to act, demonstrating a conscious disregard for his duties," Stone ex rel. AmSouth Bancorporation v. Ritter, 911 A.2d 362, 369 (Del. 2006) (citation omitted).

This is a scienter-based standard, where, as here, the company has adopted an exculpatory provision under Delaware Corporations Code § 102(b)(7). Thus, the failure-to-monitor theory is "probably the most difficult theory in corporation law upon which a plaintiff may hope to win a judgment." Caremark, 698 A.2d at 967. Under the Company's exculpatory provisions, liability is foreclosed for all but the most egregious breaches of duty – self-dealing (not alleged here with regard to the monthly employee grants) and intentional bad faith (not alleged with particularized facts in the FAC). Courts have held that allegations that board members served on an audit committee, and as a consequence, "should have been aware of the facts" underlying the theories of liability, are not sufficient to establish "scienter." See, e.g., Wood v. Baum, 953 A.2d 136, 142-43 (Del. 2008).

Here, plaintiffs have pleaded no facts showing bad faith, and have alleged only that

14

Autodesk's financial statements contained errors (which is the premise of a restatement). Desimone makes clear that the fact that a company may have accounted for backdated options incorrectly "does nothing to suggest any conscious wrongdoing on the part of the Audit Committee and is consistent with the notion that the Audit Committee was simply ignorant of any backdating." Id., 924 A.2d at 942.

Nor do plaintiffs provide any support for their claim that the Audit Committee members must have breached a duty to monitor because the backdating went on for so many years and was done so openly. Other than noting that numerous options were granted pursuant to a flawed monthly process, plaintiffs plead no facts showing that anyone other than staff involved in the process knew how it was administered – and certainly not that any of the outside directors did. As Autodesk notes, it is significant that even the Company's auditors never noticed the error during the 18 year period that it apparently went on.

As for plaintiffs' suggestion that they themselves would have treated the former CEO and the employees involved more harshly than did Autodesk's management, and would have sought to "recoup" the "millions of dollars diverted from the Company," plaintiffs appear to have ignored that the alleged failure to recoup and failure to punish is a business decision, which is not something the court considers under the Rales test.

2.      Compensation Committee Defendants

Plaintiffs allege that Bertelsen, Beveridge, Dawson, Halvorsen, and Wangberg served at various times on the Compensation Committee, and that by virtue of this service, each "kn[ew] of, or recklessly disregarded," the misdating of employee stock options. FAC ¶ 62. Plaintiffs also allege that these directors "abdicated" their responsibilities with regard to employee grants. FAC ¶ 58. Autodesk asserts, however, that plaintiffs cannot tie these five directors to the challenged grants.

In the FAC, plaintiffs allege that the Compensation Committee defendants face a substantial likelihood of liability for knowingly and recklessly allowing an institutionalized practice of backdating to exist, and that this likelihood of liability means they are incapable

15

of being disinterested. Specifically, plaintiffs contend that the allegation that the Compensation Committee members failed to "discharge the Board's responsibilities relating to certain compensation matters of the Company," see FAC ¶¶ 53, 58-60, establishes a likelihood of liability.

Nevertheless, the FAC cites to no provision in the 2007 Form 10-K or in the stock option plans that suggests that the Compensation Committee had any authority over the issuance of the backdated option grants. The Form 10-K shows that the Board delegated authority over the <u>officer</u> grants to the Compensation Committee, but delegated authority over the <u>employee</u> grants to the CEO, who acted as a "committee of one" in connection with those grants.

Rather than alleging facts showing that the Compensation Committee had any involvement with the employee grants, plaintiffs rely on a provision from the Compensation Committee's charter, which states that the purpose of the Committee is to enable the Company

> to attract, retain, and develop a highly effective management team and to discharge the Board's responsibilities relating to certain compensation matters of the Company, specifically as regards the approval of compensation for the Company's executive officers, and for certain other Human Resource policies and programs.

FAC ¶ 59.

However, nothing in this provision suggests that the phrases "certain compensation matters" and "certain other Human Resource policies and programs" encompass the mechanics of granting options to rank-and-file employees; and nothing in this provision provides any support for plaintiffs' claims. Plaintiffs are simply speculating when they read into the word "certain" a specific delegation of authority to oversee grants made to employees by the CEO.

Moreover, the reference to "executive" and "management" compensation suggest the opposite – that, consistent with the description in the 2007 Form 10-K, the Compensation Committee had authority over officer grants, while employee grants were handled by the CEO and Company staff through an "administrative process."

16

Plaintiffs do not dispute that the monthly grants were not made by or through the Compensation Committee, but by the CEO, pursuant to a grant of authority made to her directly by the Board as a whole. Thus, plaintiffs cannot allege any connection between the Compensation Committee members and the challenged grants, other than the vague theory that the reference to "certain" compensation matters in the Committee's charter gave the Committee oversight authority with respect to employee grants.

Finally, even if plaintiffs could successfully allege that the Compensation Committee had some authority over employee grants, that alone would not satisfy their burden of establishing that the members of the Committee lacked independence in connection with those specific transactions.

3.      Plaintiffs' Standing to Sue

Autodesk argues that plaintiff Giles lacks standing to pursue these derivative claims, as he did not become an Autodesk shareholder until January 2006, FAC ¶¶ 19, after the last of the challenged grants was made, and that under Rule 23.1, he lacks standing to challenge actions that occurred before he was a shareholder. As for Peach, Autodesk contends that the allegation that Peach "or her legal predecessor has held Autodesk shares continuously since 1998," FAC ¶ 20, is insufficient to establish that she has owned stock continuously from the time of purchase up to the present.

Plaintiffs contend that both Giles and Peach have standing based on the "continuing wrong" theory. According to plaintiffs, under this theory, when a complaint alleges that the defendants are engaged in a continuing wrong, a plaintiff has standing to maintain a cause of action for the entire wrong, including those portions that preceded his acquisition of stock (citing an unreported 1973 decision from the Fourth Circuit; also citing Bateson v. Magna Oil Corp., 414 F.2d 128, 130 (5th Cir. 1969); In re Omnivision Techs, Inc., 2004 WL 2397586 (N.D. Cal., Oct. 26, 2004); and Bilunka v. Sanders, 1994 WL 447156 (N.D. Cal., March 1, 1994)).

Plaintiffs concede that the "continuing wrong" theory has not been applied in litigation concerning backdating of option grants, but argue that it should apply here

17

because what is important in this case is the misrepresentation of the option grants, and the cumulative effect of the distortion of earnings – not the backdating itself.

In addition, with regard to Peach, plaintiffs claim that they have adequately alleged that she has standing.  They assert that she inherited her shares from her mother by operation of law and has owned them continuously since inheriting them, and that her mother owned the shares from 1998 until her death in 2006.  Plaintiffs assert that "operation of law" includes "shares acquired via devolution by legal succession," and that Peach has standing to bring this action.

The court finds that Giles must be dismissed for lack of standing.  A derivative plaintiff has no standing to challenge option transactions that occurred prior to the time that plaintiff owned company stock.  See In re Computer Sciences Corp. Deriv. Litig., 244 F.R.D. 580, 591 (C.D. Cal. 2007); see also Desimone, 924 A.2d at 924-27 (under Delaware law, "continuing wrong" doctrine does not afford shareholder standing to challenge earlier wrongs that pre-date his/her stock ownership).

With regard to Peach, any amended complaint must allege facts regarding her acquisition of the Autodesk stock, and she may not assert claims based on any conduct that pre-dated her mother's acquisition of the stock.

## CONCLUSION

In accordance with the foregoing, the court finds that the motion must be GRANTED.  Plaintiffs have not alleged particularized facts showing that demand on the Board would have been futile.  While it appears unlikely that they will be able to allege demand futility, the dismissal is nonetheless with leave to amend.  Any amended complaint shall be filed no later than January 23, 2009.

**IT IS SO ORDERED.**

Dated:  December 15, 2008

PHYLLIS J. HAMILTON
United States District Judge